1
2
3
4
5
6
7
8
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA
9
10
11   MICHAEL T SMITH, et al.

CASE NO. 3:22-cv-05069-DGE

Plaintiffs,

12        v.

ORDER DENYING IN PART AND
GRANTING IN DEFENDANTS'
MOTIONS TO DISMISS

13   NAPHCARE INC., et al.,

14               Defendants.

15

16                          **I**      **INTRODUCTION**

17        This matter comes before the Court on Defendants Kitsap County and NaphCare Inc.'s

18   motions to dismiss.  (Dkt. Nos. 78, 80.)  The Court considered the briefings filed in support of

19   and in opposition to the motions and the remainder of the record and hereby GRANTS in part

20   and DENIES in part Defendants' motions.

21                          **II**      **BACKGROUND**

22        This action arises out of the suicide of Jeanna Michelle Rogers while she was a pretrial

23   detainee at Kitsap County Jail ("Jail").  (Dkt. No. 77 at 26.)  Plaintiffs are Michael T. Smith, as

24

personal representative for the Estate of Jeana Rogers, and Ms. Rogers' four surviving, minor children.  (*Id.* at 4.)  Defendants include Kitsap County, Sheriff Gary Simpson, Undersheriff John Gese, and Chief of Corrections Mark Rufener (collectively, "Kitsap Policymaking Defendants") as well as five named and five unnamed "subcontractors, employees, and/or agents of Kitsap County."  (*Id.* at 5–7.)  Plaintiffs also sue NaphCare, Inc. ("NaphCare"), the healthcare provider at the Jail, NaphCare's Out-of-State Leadership,[1] and five unnamed "subcontractors, employees, and/or agents of NaphCare."  (*Id.* at 7–16.)

Plaintiffs allege Jeana Rogers was arrested "while in the midst of a serious mental health crisis" and booked into the Kitsap County Jail on October 27, 2018.  (*Id.* at 18.)  At the time of her arrest, Ms. Rogers was at the residence of Kathleen L. Smith, who had custody of Ms. Rogers' children.  (*Id.*)  Ms. Rogers attempted to physically take her children away from the residence because she believed they were being poisoned.  (*Id.* at 18–19.)  Ms. Rogers suffered from bipolar disorder, posttraumatic stress disorder, anxiety, and major depressive disorder, which limited her ability to care for herself and her four children.  (*Id.* at 18.)  As a member of the Suquamish Tribe, Ms. Rogers received mental health treatment at the Suquamish Tribal Wellness Center.  (*Id.*)  Ms. Rogers had many interactions with law enforcement before her arrest on October 27, 2018.  Several years earlier in 2010, Ms. Rogers attempted suicide while in pretrial custody at the Kitsap County Jail.  (*Id.* at 2, 18.)

After her arrest, the Jail placed Ms. Rogers in general population without a mental health professional conducting an assessment.  (*Id.* at 19.)  Over the next four months, Ms. Rogers had

---

[1] "NaphCare Out-of-State Leadership Defendants" refers to NaphCare founder Jim McLane, Chief Nursing Officer Masha Burgess, Chief Psychologist Amber H. Simpler, Chief Medical Officer Jeffrey Alvarez, Chief Executive Officer Bradford T. McLane, Senior Vice President of Jail Operations Cornelius Henderson, and Vice President of Administration Gina Savage.

multiple encounters with mental health professionals and Jail staff.  Ms. Rogers reported she was experiencing depression to an unnamed mental health professional on December 9, 2018.  (*Id.* at 21.)  Ms. Rogers also expressed delusions to Officer Campbell about drugs being smuggled through a wellness center and forced on her children.  (*Id.*)  On December 19, 2018, Ms. Rogers' fellow inmate informed a correctional officer Ms. Rogers was forcing herself to vomit, not eating, and spending most of her time in the bathroom trying to vomit but not cleaning up afterward.  (*Id.*)  Ms. Rogers told the same correctional officer she was vomiting acid and not eating because "her children [were] being poisoned with acid in their food causing them to become deaf and blind" and the Jail "food [was having] the same affect" on Ms. Rogers herself.  (*Id.*)  In January 2019, Ms. Rogers met with a NaphCare mental health professional two times.  (*See id.* at 21–22.)  Officer Timmons saw Ms. Rogers slip into the bathroom with a blanket during a lockdown in contravention of Jail rules and issued an infraction.  (*Id.*)  Ms. Rogers also pushed the emergency button in her cell on January 27, 2019.  (*Id.* at 22.)

On February 19, 2019, Ms. Rogers told Officer Daniels she was depressed and "should just have a heart attack and then it'll be resolved" and "it's too late now."  (*Id.* at 24.)  Officer Daniels contacted her supervisor, Officer Schroath, who told Daniels she did what she was supposed to do, and she should *not* document the conversation with Ms. Rogers.  (*Id.* at 24–25.)  Later that night, Officer Daniels saw Ms. Rogers picking toilet paper out of the vent above the toilet in her cell, which exposed the vent's mental slats.  (*Id.* at 25.)  At 11:00 p.m., Officer Decker started her shift and Officer Daniels told Decker there were no issues in the pods.  (*Id.*)  At 11:18 p.m., Officer Decker found Ms. Rogers with a mattress cover around her neck hanging from the vent, which was used as a tie-off point.  (*Id.* at 26.)  Officer Decker tried to lift Ms.

1  Rogers but could not do so until assisted by another officer.  (*Id.*)  Ms. Rogers died at the

2  hospital the next day on February 20, 2019.  (*Id.*)

3       Kitsap County and NaphCare move to dismiss all of Plaintiffs' claims under Federal Rule

4  of Civil Procedure 12(b)(6).  (Dkt. Nos. 78, 80.)  NaphCare also moves to dismiss all claims

5  against the NaphCare Out-of-State Leadership Defendants for lack of personal jurisdiction.

6  **III**     **DISCUSSION**

7  **A. Legal Standards**

8      1.  <u>Federal Rule of Civil Procedure 12(b)(6)</u>

9       Federal Rule of Civil Procedure 12(b)(6) motions to dismiss may be based on either the

10  lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable

11  legal theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  Material

12  allegations are taken as admitted and the complaint is construed in the plaintiff's favor.  *Keniston*

13  *v. Roberts*, 717 F.2d 1295, 1300 (9th Cir. 1983) (citations omitted).  "While a complaint attacked

14  by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

15  obligation to provide the grounds of [their] entitlement to relief requires more than labels and

16  conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl.*

17  *Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007) (citations omitted).

18      2.  <u>Federal Rule of Civil Procedure 8(a)</u>

19       Under Federal Rule of Civil Procedure 8(a)(2), a plaintiff "must plead a short and plain

20  statement of the elements of his or her claim, identifying the transaction or occurrence giving rise

21  to the claim and the elements of the prima facie case[.]"  *Bautista v. Los Angeles Cnty.*, 216 F.3d

22  837, 840 (9th Cir. 2000).  "Although the rule encourages brevity, the complaint must say enough

23  to give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it

24

1   rests.'" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Dura*

2   *Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).

3       3.   Federal Rule of Civil Procedure 12(b)(2)

4       When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears

5   the burden of showing that jurisdiction is appropriate. *Schwarzenegger v. Fred Martin Motor*

6   *Co.*, 374 F.3d 797, 800 (9th Cir. 2004). A plaintiff cannot simply rest on the bare allegations of

7   their complaint but must provide facts supporting personal jurisdiction. *See Amba Mktg. Sys.,*

8   *Inc. v. Jobar Int'l, Inc.*, 551 F.2d 784, 787 (9th Cir. 1977). When resolving such a motion on

9   written materials, a court need "only inquire into whether the plaintiff's pleadings and affidavits

10   make a prima facie showing of personal jurisdiction." *Schwarzenegger*, 374 F.3d at 800

11   (internal quotation and citation omitted).

12   **B.  42 U.S.C. § 1983 Claims**

13       A pretrial detainee has a due process right under the Fourteenth Amendment to be

14   protected from harm while in custody. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1067–68

15   (9th Cir. 2016). As relevant here, that right requires treatment of a serious medical need,

16   including "[a] heightened suicide risk[.]" *Conn v. City of Reno*, 591 F.3d 1081, 1095 (9th Cir.

17   2010), *cert. granted, judgment vacated sub nom. City of Reno, Nev. v. Conn*, 563 U.S. 915

18   (2011), and *opinion reinstated*, 658 F.3d 897 (9th Cir. 2011).

19       1.   Plaintiffs Adequately Allege a *Monell* Claim Against Kitsap County

20       There are three established scenarios in which a municipality may be liable for

21   constitutional violations under 42 U.S.C. § 1983. "First, a local government may be held liable

22   'when implementation of its official policies or established customs inflicts the constitutional

23   injury.'" *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2012) *overruled on*

24

1    *other grounds by Castro*, 833 F.3d at 1060 (quoting *Monell v. New York City Dep't of Soc.*

2    *Servs.*, 436 U.S. 658, 708 (1978)).  Second, a plaintiff can prevail by identifying acts of

3    omission, such as a pervasive failure to train its employees, "when such omissions amount to the

4    local government's own official policy."  *Id.*  Omission as the result of a failure to train is

5    established when "the need for more or different training is so obvious, and the inadequacy so

6    likely to result in the violation of constitutional rights, that the policymakers of the city can

7    reasonably be said to have been deliberately indifferent to the need."  *City of Canton, Ohio v.*

8    *Harris*, 489 U.S. 378, 390 (1989).  "A pattern of similar constitutional violations by untrained

9    employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure

10   to train" because "[w]ithout notice that a course of training is deficient in a particular respect,

11   decisionmakers can hardly be said to have deliberately chosen a training program that will cause

12   violations of constitutional rights."  *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (internal

13   citations omitted).  Third, a municipality "may be held liable under § 1983 when 'the individual

14   who committed the constitutional tort was an official with final policy-making authority' or such

15   an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'"

16   *Clouthier*, 591 F.3d at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir.

17   1992)).

18        Plaintiffs allege multiple theories of *Monell* liability.[2]  Plaintiffs allege Kitsap County

19   had a policy of placing inmates in single-occupant cells for 22 hours a day with cloth mattress

20

21   [2] Plaintiffs argue Kitsap County "had an established practice of exposing inmates to serious risk
     of harm and death by utilizing NaphCare as its sole medical provider." (Dkt. No. 85 at 12.) Kitsap

22   County allegedly paid NaphCare roughly $18 per inmate per day, which Plaintiffs argue "as a
     matter of common sense, [was] obviously inadequate to pay for necessary care." (Dkt. Nos. 77 at

23   29; 85 at 12.)  The Court questions Plaintiffs' assertion that Kitsap County's contract with
     NaphCare can be characterized as a policy or established practice under *Monell*.  Given the Court

24

ORDER DENYING IN PART AND GRANTING IN DEFENDANTS' MOTIONS TO DISMISS - 6

covers and outdated, dangerous air vents despite knowing those air vents could be used as a

hanging point for makeshift ligatures.  (Dkt. No. 77 at 20, 34.)  Kitsap County argues the Jail's

air vents, mattress covers, and single-occupant cells do not "in and of themselves . . . pose a

substantial risk of harm that was obvious" and "[i]f a government entity does not have

knowledge of a heightened risk of suicide or know of an obvious failure of its policies to address

such heightened risks, it cannot be deliberately indifferent and is not constitutionally liable[.]"

(Dkt. No. 86 at 5–6.)  Kitsap County's argument is unavailing.  Plaintiffs allege prior suicides

and suicide attempts using cloth mattress covers occurred at the Jail before Ms. Rogers' arrest,

including Ms. Rogers' suicide attempt in 2010 and an attempt by an inmate named Tessa Nall in

October 2017.  (Dkt.  No. 77 at 23.)  Plaintiffs therefore allege facts which, when viewed in the

light most favorable to Plaintiffs, support their contention that Kitsap County knew their

established practice for conditions of confinement posed a risk to Ms. Rogers' health and safety.

Plaintiffs also assert a *Monell* claim based on Kitsap County's alleged failure to properly

train its jailers.  Plaintiffs allege "the fact that, across nearly four months, with numerous daily

interactions with Kitsap County staff, [Ms. Rogers] exhibited obvious worsening symptoms of

mental illness, yet no intervention or treatment were provided, evidences a larger systemic

problem at the Jail, which could only be described as a lack of appropriate training."  (*Id.*)

Kitsap County argues Plaintiffs make "no factual allegations to support such a conclusion" nor

do they identify a pattern of constitutional violations.  (Dkt. No. 78 at 18.)  But, in so arguing,

Kitsap County overlooks the previous suicides and suicide attempts at the Jail.  In total, Plaintiffs

identify at least five suicides since 2010, which occurred prior to Ms. Rogers' death.  (Dkt. No.

---

finds that Plaintiffs sufficiently allege a § 1983 claim against Kitsap County under other theories
of liability, it does not consider the viability of Plaintiffs' allegations against Kitsap County based
on its decision to contract with NaphCare.

77 at 32.)  Given this history, Plaintiff makes a plausible claim that can survive a motion under Federal Rule of Civil Procedure 12(b)(6).  Whether the prior suicides involve facts similar enough to Ms. Rogers' death, such that a reasonable juror could find Kitsap County should have known it needed to better train its jailers to protect against in-custody suicide, is an issue that may be determined at summary judgment once the factual record if fully developed.  Kitsap County's motion to dismiss is DENIED as to Plaintiffs' *Monell* claim against Kitsap County.

### 2.  Plaintiffs Fail to State a *Monell* Claim Against NaphCare Inc.

Plaintiffs posit four theories of *Monell* liability, all of which fail to state a valid claim. First, Plaintiffs argue NaphCare did not have a records system that flagged previous suicide attempts by repeat inmates, which lead to severely inadequate conditions of confinement for Ms. Rogers.  (Dkt. No. 85 at 11.)  Because NaphCare did not take over inmate health care services until January 1, 2019, NaphCare was not the medical provider at the Jail during Ms. Rogers' booking.  (*See* Dkt. No. 77 at 18, 28.)   Plaintiffs fail to show how NaphCare's intake system relates to Ms. Rogers given that NaphCare did not conduct her intake.

Second, Plaintiffs argue NaphCare operates under an established practice of putting profit over care that puts vulnerable patients at risk of serious harm or death.  (Dkt. No. 88 at 8) (citing Dkt. No. 77 at 10).  NaphCare argues "profits over care" is Plaintiffs' theme of the case, not an unconstitutional custom or practice.  (Dkt. No. 90 at 7.)  Plaintiff responds, "the SAC includes a litany of past instances of [un]constitutional allegations based on deliberate indifference to serious medical needs against NaphCare, including a policy of cutting costs and maximizing profits to the detriment of the patients that it ostensibly serves."  (Dkt. No. 88 at 8.)

Plaintiffs' response fails to identify a specific NaphCare policy designed to prioritize profit nor does the general assertion "profit over care" provide a policy, established practice, or

custom in the abstract.[3]  (*See generally* Dkt. No. 88.)  Yet, the Court's analysis does not end at

Plaintiffs' response.  In the Second Amended Complaint ("SAC"), Plaintiffs allege two mental

health professionals evaluated Ms. Rogers, and both failed to provide intervening treatment

despite noticeable deterioration of Ms. Rogers' mental health.  Plaintiffs also cite nine incidents

in other NaphCare facilities as evidence of a widespread or persistent custom.  But the examples

Plaintiffs cite do not involve similar circumstances.  One incident involves NaphCare failing to

properly screen inmates for mental health issues during the booking process.  (*See* Dkt. No. 77 at

30) (citing *Dawson v. S. Corr. Entity*, No. 19-1987, 2021 WL 4244202, at *6 (W.D. Wash. Sept.

17, 2021)).  Here, NaphCare was not the provider at the Jail until several months after Ms.

Rogers' intake screening and booking.  Several incidents involve NaphCare denying or refusing

to pay for offsite care or refusing to carry out treatments prescribed by an offsite provider.  (*Id.* at

30–31) (citing *Tapia v. Pierce Cnty.*, No. 21-2-04263-1 (King Cty. Super.); *Brown v. Clark Cnty.*

*Det. Ctr.*, No. 15-324, 2018 WL 1457292, at *7 (D. Nev. Mar. 23, 2018); and *O'Neal v. Las*

---

[3] Plaintiffs allege NaphCare "employed insufficient numbers of sufficiently credentialed medical and mental health providers to meet the reasonable and necessary healthcare needs of inmates." (Dkt. No. 77 at 32.)  Plaintiffs also allege NaphCare appointed a radiologist named Dr. Sandack as the Jail's Medical Director even though they were allegedly "not qualified for the position" and too busy to "provide reasonable or constitutionally adequate care to inmates[.]"  (*Id.*)  At first blush, these allegations appear to allege an established practice of understaffing or failing to employ qualified providers.  But Plaintiffs do not allege understaffing or Dr. Sandack's questionable qualifications led to Ms. Rogers' death.  Indeed, there are no allegations connecting Dr. Sandack to Ms. Rogers in any way.

This case is distinguishable from this Court's order upholding the plaintiffs' *Monell* claim in *Rapp v. NaphCare Inc.*, No. 3:21-cv-05800-DGE, 2023 WL 372825, at *1 (W.D. Wash. Jan. 24, 2023).  In *Rapp*, the plaintiffs alleged NaphCare policies and established practices put profit before care by telling inmates they would have to pay for any medical care found to be unnecessary and Dr. Sandack relied on Licensed Practical Nurses (LPNs) to make her treatment decisions.  Relying on LPNs, without examining an inmate patient, Dr. Sandack ordered medications for him which failed to prevent his subsequent suicide while in custody.  *Id.*; *Rapp v. NaphCare, Inc.*, No. 3:21-CV-05800-DGE, 2022 WL 17793961, at *6 (W.D. Wash. Dec. 19, 2022).

1    *Vegas Metro. Police Dep't*, No. 17-2765, 2018 WL 4088002, at *4 (D. Nev. Aug. 27, 2018)).

2    However, Plaintiffs do not allege Ms. Rogers required hospital or offsite care.  The remaining

3    examples involve NaphCare delaying doctor visits because of deliberate understaffing and

4    failing to treat HIV-positive prisoners as well as inmates with diabetes.  (*Id.* at 31.)  These

5    examples are not analogous to NaphCare's conduct toward Ms. Rogers.  *See Burghart v. S. Corr.*

6    *Entity*, No. C22-1248 TSZ, 2023 WL 1766258, at *5 (W.D. Wash. Feb. 3, 2023) (dismissing the

7    plaintiffs' *Monell* claim against NaphCare because the nurses' errors in treating an inmate

8    experiencing alcohol withdrawal "sound[ed] in individualized negligence, not an overarching

9    policy.")  Thus, Plaintiffs do not identify an established practice that was the moving force

10   behind Ms. Rogers' death.

11        Third, Plaintiffs allege NaphCare decisionmakers "failed to adequately train, re-train, or

12   discipline employees[.]"  (Dkt. No. 77 at 3.)  Plaintiffs further allege "[t]here was an obvious

13   need for more or different training without which [] constitutional violations were likely to

14   occur."  (*Id.* at 39.)  Plaintiffs do not allege any facts about how NaphCare employees are trained

15   nor about how NaphCare decisionmakers knew the training programs were deficient.  Unlike

16   their failure to train claim against Kitsap County, Plaintiffs do not allege previous suicides had

17   taken place under NaphCare's tenure.  Plaintiffs state that two suicides occurred during the first

18   year NaphCare provided services at the Jail.  (*Id.* at 32.)  NaphCare began providing its services

19   on January 1, 2019.  Ms. Rogers' committed suicide on February 19, 2019, which accounts for

20   one of the incidents Plaintiffs mention.  It is unclear when the second alleged suicide took place

21   or, importantly, if it took place before Ms. Rogers' death.  Plaintiffs therefore do not identify

22   suicides or attempted suicides occurring prior to Ms. Rogers' death that would have notified

23   NaphCare of its deficient training.  Without this pattern, the Court is left with Plaintiffs

24

ORDER DENYING IN PART AND GRANTING IN DEFENDANTS' MOTIONS TO DISMISS - 10

conclusory allegation that a need for more training was obvious without information about what kind of training took place, which cannot by itself state a *Monell* claim.

Fourth, Plaintiffs allege the NaphCare policymakers ratified the "conduct of Jail staff" because "they were aware of the detailed facts and circumstances of [Ms. Rogers'] death . . . because they [] commissioned detailed reports and reviewed them for wrongdoing and negligence, found none and [took] no corrective or disciplinary action."  (Dkt. No. 77 at 3–4.) Although *Monell* liability may attach under a ratification theory if an authorized policymaker approves a subordinate's decision and the basis for it, a mere failure to overrule a subordinate's actions, without more, cannot support a claim.  *Koenig v. City of Bainbridge Island*, No. C10-5700 RJB, 2011 WL 3759779, at *8 (W.D. Wash. Aug. 25, 2011) (citing *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004)).  A "single failure to discipline" does not usually raise to the level of ratification without special circumstances.  *See Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003), *overruled on other grounds*, 543 U.S. 194 (2004).  Plaintiffs have merely alleged that NaphCare failed to discipline its employees John Doe 6 and John Doe 7.  Standing alone, this cannot support a ratification theory.  NaphCare's motion to dismiss is GRANTED as to Plaintiffs' § 1983 claim against NaphCare.

### 3.  Individual Defendants

Pretrial detainee medical claims are "evaluated under an objective deliberate indifference standard."  *Vasquez v. Cnty. of Santa Clara*, 803 Fed. App'x 100, 102 (9th Cir. 2020) (quoting *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–1125 (9th Cir. 2018)).

> [T]he elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are: (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances

would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125.  As for the third element, a plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

Plaintiffs allege Jail staff "knew or reasonably should have known . . . that [Ms. Rogers] had serious mental illness and was in crisis during her incarceration between October 27, 2018 and her death in February 2019." (Dkt. No. 77 at 23.)  Plaintiffs assert:

> [All individual Defendants] made an intentional decision with respect to the care provided to [Ms. Rogers] which put her at substantial risk of suffering serious harm and failed to take reasonable available measures to abate that risk, even though a reasonable jailer or medical provider in the circumstances would have appreciated the high degree of risk involved.

(*Id.* at 38.)

i.   Sara Timmons

Plaintiffs allege Officer Timmons observed Ms. Rogers "slipping into a[n] unoccupied and unsupervised bathroom with a blanket during lockdown" on January 17, 2019.  (*Id.* at 21.) Plaintiffs also allege "[f]or an inmate with [Ms. Rogers'] known mental illness (not to mention a known history of at least one in-custody suicide attempt using a makeshift ligature), this should have raised bright red flags."  (*Id.*)  Officer Timmons did not take any action that might have led to intervention or recommend treatment for Ms. Rogers; instead, she gave Ms. Rogers an infraction for being out of her room during lockdown.  (*Id.* at 22.)

Kitsap County argues "[t]he SAC . . . conclusory states that Timmons should have known Ms. Rogers had a serious mental illness and was in crises during her incarceration."  (Dkt. No. 78 at 7.)  The Court agrees Plaintiffs provide no facts to support their contention that Officer Timmons knew of Ms. Rogers' suicide attempt at the Jail in 2010.  Ms. Rogers' suicide attempt

occurred several years before 2019, and Plaintiffs do not allege facts to suggest Officer Timmons had been informed of Ms. Rogers' history.  But even if the Court sets aside Plaintiffs' allegation about Ms. Rogers' past suicide attempt, there is some support for Plaintiffs' contention that Officer Timmons should have known Ms. Rogers was in crisis during her incarceration. Specifically, Plaintiffs allege Ms. Rogers' mental health problems were known to jail staff that personally interacted with her given her erratic behavior, which included refusing to eat and expressing delusions and paranoia.  Whether "slipping into a[n] unoccupied and unsupervised bathroom with a blanket during lockdown" should have raised red flags to Officer Timmons, under the circumstances, requires further factual development.  Likewise, whether the interaction between Officer Timmons and Ms. Rogers occurred near enough to Ms. Rogers' suicide to sustain a claim against Officer Timmons requires further factual development.  In short, although the complete factual record may ultimately prove insufficient to withstand a request for summary judgment, the basic facts in the SAC implicating Officer Timmons overcome the motion to dismiss.  Thus, Kitsap County's motion to dismiss is DENIED as to the § 1983 claim against Officer Timmons.

  *ii.  Jordan Campbell*

  Plaintiffs allege Ms. Rogers approached Officer Campbell "expressing obvious delusions" about drugs being forced on her children in foster care on December 13, 2018.  (Dkt. No. 77 at 21.)  Plaintiffs also allege, on January 27, 2019, Ms. Rogers "made another cry for help" by pushing the emergency button in her cell.  Officer Campbell responded to the call but did not intervene to secure treatment for Ms. Rogers.  (*Id.* at 22.)

Kitsap County argues "the SAC does not explain if [Ms. Rogers made] a literal cry for help or a figurative/metaphorical cry for help" nor does it "explain how [Officer Campbell's] conduct fell

constitutionally short." (Dkt. No. 78 at 2.) Viewing the facts in the light most favorable to Plaintiffs, Officer Campbell observed Ms. Rogers "in crises" on at least two occasions when she expressed delusional fears about her children and when she used the emergency button in her cell, which supports Plaintiffs' claim Officer Campbell failed to take reasonable measures to abate the risk posed by Ms. Rogers' deteriorating mental health. Whether Officer Campbell's failure to recognize Ms. Rogers' behavior as a sign of her worsening mental illness and subsequent failure to intervene amounts to deliberate indifference requires further factual development. Like the claim against Officer Timmons, the factual record supporting the claim against Officer Campbell may ultimately be insufficient to withstand a motion for summary judgment, but the basic facts in the SAC suffice at this juncture. As a result, Kitsap County's motion to dismiss is DENIED as to the § 1983 claim against Officer Timmons.

### iii. Melanie Daniels and Wade Schroath

Plaintiffs allege, on the day of Ms. Rogers death, Officer Daniels conducted a walk-through and "noticed that [Ms. Rogers] was not acting like her normal self." Ms. Rogers told Officer Daniels she was "depressed" and "should just have a heart attack and then it'll be resolved" and "it's too late now." Officer Daniels contacted her supervisor, Officer Schroath, who "said there was nothing that indicated to him that action was warranted" and Officer Daniels "did what she was supposed to do." (Dkt. No. 77 at 24–25.) Then, Officer Schroath allegedly instructed Officer Daniels *not* to document the conversation with Ms. Rogers. (*Id.*) Later that night, Officer Daniels observed Ms. Rogers "picking toilet paper out of the vent above the toilet in her cell" but did not report it "despite this being an indicator of suicidality" because these types of vents "were known to be used as ligature tie off points." (*Id.* at 25.)

1    Kitsap County argues Plaintiffs assert insufficient allegations to support § 1983 claims

2   against Officers Daniels and Wade Schroath because "[t]he SAC contains very little new factual

3   allegations" and the Court dismissed Plaintiff's First Amended Complaint ("FAC").  (Dkt. No.

4   78 at 8–9.)  The Court disagrees with Kitsap County's characterization of Plaintiffs'

5   amendments.  The SAC adds that Officer Schroath instructed Officer Daniels not to record her

6   conversation with Ms. Rogers and the SAC alleges the vents in Ms. Rogers cell were known to

7   "be used as a hanging point for makeshift ligatures" and "standard practice in correctional

8   institutions across the county is to use 'break away vents' or 'risk resistant retrofit grills[.]'"

9   (Dkt. No. 77 at 24.)  Plaintiffs' SAC allegations sufficiently state a claim of deliberate

10   indifference, and therefore, Kitsap County's motion to dismiss is DENIED as to the § 1983

11   claims against Officers Daniels and Schroath.

12       *iv.  Elvia Decker*

13    Plaintiffs assert Officer Decker knew Ms. Rogers was "having issues," as she believed

14   her food was being poisoned, she was not eating, and staff was monitoring her food intake.  (*Id.*

15   at 22–23.)  Plaintiffs maintain Officer Decker had "general knowledge of [Ms. Roger's] severe

16   mental illness from personal experience," but did not know "about [Ms. Roger's] . . . depressive

17   or suicidal expressions [made near the time of her death.]"  (*Id.* at 25.)

18    The night Ms. Rogers' died Officer Decker began her shift at 11:00 p.m.  (*Id.*)   Officer

19   Daniels told Officer Decker "there were no issues in the pods."  (*Id.*)  Eighteen minutes later

20   Officer Decker found Ms. Rogers hanging unconscious and attempted to lift Ms. Rogers but

21   could not do so.  (*Id.* at 26.)  With help from another officer, Officer Decker managed to cut the

22   mattress cover off the vent and lay Ms. Rogers onto the floor.  (*Id.*)

23

24

1         Kitsap County argues Plaintiffs "fail to assert that Decker was aware of, and disregarded,

2    a serious risk to Ms. Rogers' health during eighteen minutes of her shift prior to discovering Ms.

3    Rogers was unconscious" at which time Officer Decker tried to rescue Ms. Rogers.  (Dkt. No. 78

4    at 7.)  The only failure Plaintiffs identify is that Officer Decker "did not have a tool to cut [Ms.

5    Rogers] down quickly and there was a significant delay in getting [her] down from [her] hanging

6    position—a delay that more likely than not extinguished any chance of life."  (Dkt. No. 77 at 26.)

7    At the same time, Plaintiffs allege Kitsap County does not issue rescue tools that jailers can carry

8    on their person in case they encounter an asphyxiating inmate.  (*Id.* at 33.)  In other words,

9    Plaintiffs argue Officer Decker showed deliberate indifference by not carrying on her person a

10   "rescue tool" that was not required or issued by her superiors.  Plaintiffs fail to show how such

11   inaction amounts to deliberate indifference by Officer Decker.  Kitsap County's Motion to

12   Dismiss is GRANTED as to the § 1983 claim against Officer Decker.

13        *v.   Does 1-5*

14        Plaintiffs assert § 1983 claims against five unnamed "subcontractors, employees, and/or

15   agents of Kitsap County[.]"  (*Id.* at 7.)  In the Ninth Circuit, where the identity of the alleged

16   defendant is not known before filing a complaint, "the plaintiff should be given an opportunity

17   through discovery to identify the unknown defendants, unless it is clear that discovery would not

18   uncover the identities, or that the complaint would be dismissed on other grounds."  *Wakefield v.*

19   *Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (internal quotations omitted).  Kitsap County

20   argues Plaintiffs make merely conclusory allegations against Defendant Does 1–5, which cannot

21   state a claim.  (Dkt. No. 78 at 11.)  Plaintiffs counter by identifying twelve paragraphs of the

22   SAC in which they reference Does 1–5 and supposedly "make[] factual allegations against

23   them[.]"  (Dkt. No. 85 at 21.)

24

1    The Court agrees with Kitsap County and finds all Plaintiffs allegations against

2    Defendants Does 1–5 to be conclusory statements without sufficient facts to sustain plausible

3    claims against any individual—instead, Plaintiffs claim hypothetical persons could have been

4    involved.  Therefore, Kitsap County's motion to dismiss is GRANTED as to the § 1983 claims

5    against John Does 1–5.

6            *vi.  Does 6-10*

7        Plaintiffs bring § 1983 claims against five unnamed Defendants who are "subcontractors,

8    employees, and/or agents of NaphCare[.]"  (Dkt. No. 77 at 16.)  Plaintiffs allege an unnamed

9    mental health professional who was not employed by NaphCare[4] evaluated Ms. Rogers after she

10   submitted a "medical kite" on December 9, 2018.  (*Id.* at 21.)  Ms. Rogers reported feeling

11   depressed, and the mental health professional observed Ms. Rogers "was exhibiting a serious

12   paranoia."  (*Id.*)  The mental health professional "was informed that [Ms. Rogers] had previously

13   been diagnosed with PTSD, anxiety, and depression." (*Id.*)

14       On January 10, 2019, a NaphCare mental health professional, John Doe 6, met with Ms.

15   Rogers and "presumably knew of [her] previously disclosed serious mental illnesses and

16   increasingly delusional behavior and thoughts," including refusing to eat and feelings of

17   depression.  (*Id.*)  John Doe 6 did not recommend treatment or intervention.  On January 24,

18   2019, Ms. Rogers "was again seen by a NaphCare [mental health professional] Joe Doe 7."[5]  (*Id.*

19

20

21   ―――――――――――――――――
     [4] NaphCare began providing services at the Jail on January 1, 2019, which was after this alleged
     evaluation took place.

22   [5] It is unclear from Plaintiffs' allegations whether Ms. Rogers met with the same mental health
23   professional or different mental health professionals while in custody.  Because Plaintiffs allege
     Ms. Rogers met with both Joe Doe 6 and Joe Doe 7, the Court assumes Plaintiffs refer to two
24   different individual, unnamed defendants.

at 22.)  John Doe 7 noted Ms. Rogers was "clearly disorganized in her thoughts with delusional content[,]" but did not recommend intervention or treatment.  (*Id.*)

Defendants provide as supplemental authority a recent order from our sister court in *Burghart*.  (*See* Dkt. No. 99 at 3–13.)  In *Burghart*, the court found the plaintiffs failed to show NaphCare nurses acted with deliberate indifference when they failed to take all necessary efforts to care for an inmate suffering from alcohol withdrawal because a lack of due care does not rise to objectively unreasonable conduct.  *Burghart*, No. C22-1248 TSZ, 2023 WL 1766258, at *4. Here, the Court diverges because whether NaphCare mental health professionals acted with deliberate indifference versus lack of due care is, in this case, better decided on summary judgment with a full factual record.

Plaintiffs have alleged sufficient facts to state a claim against NaphCare John Does 6 and 7.  As a result, NaphCare's motion to dismiss is DENIED as to John Doe 6 and John Doe 7 but GRANTED as to John Does 8, 9, and 10.

4.  <u>Supervisory Liability</u>

In the Ninth Circuit, liability is imposed against "a supervisory official in [their] individual capacity for [their] own culpable action or inaction in the training, supervision, or control of [their] subordinates, for [their] acquiescence in the constitutional deprivations of which the complaint is made, or for conduct that showed a reckless or callous indifference to the rights of others."  *Corales v. Bennett*, 567 F.3d 554, 570 (9th Cir. 2009).  Supervisory officials may be held liable if they implement a policy so deficient that the policy "itself is a repudiation of constitutional rights" and is "the moving force of a constitutional violation."  *See Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989).  An action based on unconstitutional conditions of confinement requires a showing that a supervisor acted, or failed to act, in a manner that was

deliberately indifferent to an inmate's constitutional rights.  *Starr v. Baca*, 652 F.3d 1202, 1206–07 (9th Cir. 2011)

      i.    *Gary Simpson, Mark Rufener, and John Gese*

Plaintiff sues Defendants Simpson, Rufener, and Gese in their individual capacity, referring to them collectively as "Kitsap Policymaking Defendants."  Kitsap County argues "[t]he SAC fails to assert any factual allegations to support a § 1983 deliberate indifferent claim against Gese, Rufener, and Simpson."[6]  (Dkt. No. 78 at 10.)  Once more Kitsap County overlooks the previous suicides and suicide attempts at the Jail, which for purposes of this motion is sufficient to support the *Monell* claim based on an alleged failure to train.  *See supra* Part III, Section B.1.  Plaintiffs further allege the Kitsap Policymaking Defendants were responsible for training Jail staff and yet failed to adequately train officers and employees to "properly identify and monitor at-risk inmates" which resulted in Ms. Rogers not receiving adequate mental health care and, ultimately, committing suicide.  (*See* Dkt. No. 77 at 35.)  Plaintiffs allege Kitsap Policymaking Defendants knew about the risks of harm created by this lack of training because of previous suicide attempts at the Jail.  (*See id.* at 35, 39.)  Thus, Kitsap County's motion to dismiss is DENIED as to Kitsap Policymaking Defendants Simpson, Rufener, and Gese.

     5.   <u>The Court Lacks Personal Jurisdiction Over NaphCare's Out-of-State Leadership</u>

---

[6] Plaintiffs allege the Kitsap Policymaking Defendants "ratified" the conduct of jail staff in their interactions with Ms. Rogers.  (Dkt. No. 77 at 39.)  Plaintiffs assert the Kitsap Policymaking Defendants were aware of the details of Ms. Rogers' death because they commissioned and reviewed reports for wrongdoing and decided to take no disciplinary action.  (*Id.* at 3–4.)  Generally, a final policymaker's "ratification" of an employee's conduct which caused a constitutional violation supports a *Monell* claim against a municipality.  It is unclear from the SAC whether Plaintiffs intend to use ratification by a final policymaker to assert municipal liability or supervisory liability.  In any event, Plaintiffs' failure to train allegations support supervisory liability of the Kitsap Policymakers in their individual capacity so the Court does not consider whether Plaintiffs make a proper ratification argument about the Kitsap Policymaking Defendants.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

NaphCare moves to dismiss Plaintiffs' claims against the NaphCare Out-of-State Leadership Defendants for lack of personal jurisdiction.  (Dkt. No. 80 at 16.)  The Court's previous order dismissing Plaintiffs' FAC reserved judgment but noted "[i]t does appear NaphCare has raised significant issues of the lack of purposeful direction and intentional acts by most of, if not all, NaphCare's Out-of-State Leadership Defendants."  (Dkt. No. 74 at 18.)

"Federal courts apply state law to determine the bounds of their jurisdiction over a party." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1020 (9th Cir. 2017) (citing Fed. R. Civ. P. 4(k)(l)(A)).  Revised Code of Washington § 4.28.185 "extends jurisdiction to the limit of federal due process." *Shute v. Carnival Cruise Lines*, 783 P.2d 78, 82 (Wash. 1989).  The due process clause grants a court jurisdiction over defendants who have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotations omitted).  Personal jurisdiction can be either general or specific.  *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) *overruled in part on other grounds by Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc).  Plaintiffs do not allege the NaphCare Out-of-State Leadership Defendants are subject to general jurisdiction.  None of the individual Defendants are residents of Washington state.  Thus, only specific jurisdiction is at issue.

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014)).  Two principles guide this inquiry: first, this relationship must arise from contacts that the defendant personally creates with the forum state.  *Walden*, 571

U.S. at 284.  In other words, a plaintiff's or a third party's contacts with the forum state cannot be the basis for jurisdiction over the defendant.  *Id.*   This is because due process in this context "principally protect[s] the liberty of the nonresident defendant—not the convenience of plaintiffs or third parties."  *Id.*  Second, the "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  *Id.* at 285.

The Ninth Circuit applies a three-part test to determine whether the exercise of specific jurisdiction over a nonresident defendant is appropriate: (1) the defendant has either purposefully directed his activities toward the forum or purposely availed himself of the privileges of conducting activities in the forum; (2) the claims arise out of the defendant's forum-related activities; and (3) exercise of jurisdiction is reasonable.  *Axiom*, 874 F.3d at 1068 (citations and quotations omitted).  For "purposeful direction," courts apply the three-part test from *Calder v. Jones*, 465 U.S. 783 (1984), which asks whether the defendant (1) committed an intentional act, (2) expressly aimed at the forum, (3) causing harm that it knows is likely to be suffered there. *Axiom*, 874 F.3d at 1069.

Plaintiffs make the same allegations against Defendants Susanne Moore, Marsha Burgess, Amber Simpler, Jeffrey Alvarez, Bradford McLane, Cornelius Henderson, and Gina Savage.

> Defendant [Moore, Burgess, Simpler, Alvarez, Bradford McLane, Henderson, Savage] purposefully availed [herself/himself] of Washington State or purposefully availed [herself/himself] of the privileges of conducting activities in Washington State by, among other things, working with key stakeholders in Washington State to secure and administer the contract with Kitsap County and collecting profits off said contract.  Further, [she/he] was responsible for, and did, personally and intentionally approve, condone, or ratify the policies, procedures, and practices directed at the services NaphCare provided to the Kitsap County Jail.  [Her/his] actions accordingly, directly caused the harm suffered by Jeana as a result of these policies, procedures, and practices.

1

2

(Dkt. No. 77 at 11–16.)

3    Plaintiffs do not satisfy the *Calder* test because they fail to allege Defendants Moore,

4    Burgess, Simpler, Alvarez, Bradford McLane, Henderson, and Savage committed an intentional

5    act targeted at Washington.  Plaintiffs may not rely on "mere 'bare bones' assertions of minimum

6    contacts with the forum" and "legal conclusions unsupported by specific factual allegations will

7    not satisfy a plaintiff's pleading burden."  *See Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir.

8    2007).  Plaintiffs contend Defendants Moore, Burges, Simpler, Alvarez, Bradford McLane,

9    Henderson, and Savage approved, condoned, or ratified policies at the Jail, but do not mention

10    any NaphCare policy that the individual Defendants specifically administered or approved.  Nor

11    have they explained how any policies or customs were the result of intentional acts by these

12    Defendants.  Essentially, Plaintiffs argue the Court has personal jurisdiction over these

13    Defendants because of their positions as executives of NaphCare.  This does not provide a proper

14    basis for personal jurisdiction over these Defendants in their individual capacity.  *See Davis v.

15    Metro Prods., Inc.*, 885 F.2d 515, 520 (9th Cir. 1989) ("[A] person's mere association with a

16    corporation that causes injury in the forum state is not sufficient in itself to permit that forum to

17    assert jurisdiction over the person[.]"  They may only be liable when they are the "guiding spirit"

18    or "central figure" in the wrongful conduct.).

19    Plaintiffs also allege Defendants Moore, Burgess, Simpler, Alvarez, Bradford McLane,

20    Henderson, and Savage have contacts with this forum because they worked with "key

21    stakeholders in Washington" to secure and administer the contract with Kitsap County.  (Dkt.

22    No. 77 at 10–16.)  First, Plaintiffs provide no factual support for these contentions.  Instead,

23    Plaintiffs apply the same conclusory language to each of the individual Defendants without

24    specifying their role in securing the contract.  Second, even if the Court assumes Plaintiffs satisfy

1   the first two prongs of the *Calder* test, Plaintiffs fail to explain how Ms. Rogers' injuries arose

2   out of Defendants' forum-related activities.  The Ninth Circuit uses a "but for" test to determine

3   whether a plaintiff's claims arise out of a defendant's forum-related conduct.  *Menken v. Emm*,

4   503 F.3d 1050, 1058 (9th Cir. 2007) (citation omitted).  Plaintiffs do not explain how Ms.

5   Rogers' death arose out of these Defendants' roles in securing and administering the contract

6   with Kitsap County Jail.  Plaintiffs' allegations are far too attenuated to be a "but for" cause of

7   Plaintiffs' injuries.

8           Plaintiffs' allegations differ slightly as to NaphCare Founder, Owner, and Chairman of

9   the Board, Defendant Jim McLane.  Defendant Jim McLane allegedly marketed to Washington

10  municipalities and personally endorsed the contract with Kitsap County.  (Dkt. No. 77 at 10.)

11  Nonetheless, these allegations fail for the same reasons because Plaintiffs fail to explain how Ms.

12  Rogers' death arose out of Defendant Jim McLane's role in marketing NaphCare and endorsing

13  the contract with Kitsap County Jail.  Plaintiffs do not allege facts about how Defendant Jim

14  McLane participated in NaphCare marketing, nor do they allege facts connecting any type of

15  marketing to their injuries.  Further, Defendant Jim McLane's endorsement of the contract

16  between Kitsap County and NaphCare is too attenuated to be a "but for" cause of Ms. Rogers'

17  death.

18          Plaintiffs argue their allegations against the NaphCare Out-of-State Leadership

19  Defendants are analogous to *In re JUUL Labs, Inc., Mktg., Sales Pracs. & Prod. Liab. Litig.*, 497

20  F. Supp. 3d 552, 676 (N.D. Cal. 2020) and *Commonwealth v. Purdue Pharma, L.P.*, No.

21  1884CV01808, 2019 WL 5617817, at *8 (Mass. Super. Oct. 8, 2019).  However, Plaintiffs'

22  allegations are clearly distinguishable.  In *JUULS Labs Inc..*, the California district court found

23  personal jurisdiction over executives outside of their home states based on these officials'

24

1   personal participation in developing "the marketing strategy to target teens and then pushed for

2   aggressive implementation of that strategy nationwide" because they "directed and intended their

3   actions at each of the forum states and nationwide." 497 F. Supp. 3d at 675.  The marketing

4   strategy was alleged to be the "but for" cause of the plaintiff's claims. *Id*. at 677.  ("The

5   government entities allege that 'but for' the . . . Defendants' efforts to develop and maintain a

6   nationwide youth nicotine market . . . they would not have been injured.")  Similarly, personal

7   jurisdiction in *Purdue Pharma* also relied on targeted marketing campaigns by individual

8   defendant executives that caused the plaintiff's injury. *See No.* 1884CV01808, 2019 WL

9   5617817, at *7.

10       Here, Plaintiffs do not identify any strategy or marketing participation by NaphCare

11   executives.  Nor do they identify the connection between those strategies and how they were the

12   'but for' cause of Ms. Rogers' death.  Therefore, the Court lacks jurisdiction over the NaphCare

13   Out-of-State Leadership Defendants and GRANTS NaphCare's motion to dismiss on these

14   grounds.

15       Plaintiffs argue "the Court should defer ruling on the motion to dismiss for lack of

16   personal jurisdiction under Rule 12(b)(2) pending jurisdictional discovery."  (Dkt. No. 88 at 16.)

17   District courts have discretion to permit jurisdictional discovery where "pertinent facts bearing

18   on the question of jurisdiction are controverted or where a more satisfactory showing of the facts

19   is necessary." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (internal quotation

20   marks omitted).  District courts may deny discovery if the request is "based on little more than a

21   hunch that it might yield jurisdictionally relevant facts[.]" *Id.*; *see also Digit. Mentor, Inc. v.*

22   *Ovivo USA, LLC*, No. C17-1935-RAJ, 2018 WL 6724765, at *4 (W.D. Wash. Dec. 21, 2018)

23

24

ORDER DENYING IN PART AND GRANTING IN DEFENDANTS' MOTIONS TO DISMISS - 24

1  (denying jurisdictional discovery where the plaintiff does not make factual allegations to suggest

2  jurisdiction exists and fails to identify the discovery they seek).

3       In this case, Plaintiffs received leave to amend twice and still fail to make allegations that

4  suggest this Court has personal jurisdiction over the NaphCare Out-of-State Defendants.

5  Plaintiffs fail to identify the conduct and discovery they seek to uncover that would support

6  personal jurisdiction.  Accordingly, the Court DENIES Plaintiffs' request to conduct

7  jurisdictional discovery.

8  **C. Negligence Claims**

9      1.  <u>Plaintiffs Allege Negligence Claims Against Kitsap County</u>

10       To prove negligence, a plaintiff must establish the existence of a duty owed, breach of

11  that duty, and proximate cause between breach and injury.  *Tincani v. Inland Empire Zoological*

12  *Soc.*, 875 P.2d 621, 624 (Wash. 1994).  "Washington courts have long recognized a jailor's

13  special relationship with inmates, particularly the duty to ensure health, welfare, and safety."

14  *Gregoire v. City of Oak Harbor*, 244 P.3d 924, 928 (Wash. 2010) (citation omitted).  A "jail's

15  duty to protect inmates includes protection from self-inflicted harm[.]"  *Id.* at 931.  Gross

16  negligence is "negligence substantially and appreciably greater than ordinary negligence."  *Nist*

17  *v. Tudor*, 407 P.2d 798, 803 (Wash. 1965).

18       Kitsap County argues Plaintiffs' negligence and gross negligence claims should be

19  dismissed because the SAC "continues to lump all the alleged conduct of all the defendants

20  together rather than clearly articulating the standards of care that were allegedly breached by

21  each specific employee[.]"  (Dkt. No. 78 at 19.)  In other words, Kitsap County argues Plaintiffs'

22  SAC is too confusing to meet the standards of Federal Rule of Civil Procedure 8(a).[7]  However,

23

24  ----
[7] The Court acknowledges the SAC (like the FAC) was at times difficult to review and analyze.

1    Plaintiffs do identify specific jailors and the dates and times of their interactions with Ms. Rogers

2    that support their claims.  Having thoroughly reviewed the SAC and viewing it in the light most

3    favorable to Plaintiff, the Court finds Federal Rule of Civil Procedure 8(a) is satisfied because

4    the SAC has just enough facts to provide fair notice of the grounds upon which their claims rest.

5    Therefore, Kitsap County's motion to dismiss is DENIED as to Plaintiffs' negligence and gross

6    negligence claims against Kitsap County.

7        2.   Plaintiffs Allege a Medical Negligence Claim Against NaphCare

8        NaphCare argues Plaintiffs waived their right to bring negligence and gross negligence

9    claims because, in a briefing on the FAC, Plaintiffs stated they were not bringing negligence

10   claims.  (Dkt. No. 80 at 8.)  But NaphCare fails to cite authority prohibiting a plaintiff from

11   bringing alternative claims for relief after a court granted leave to amend.  Plaintiffs stated they

12   were not bringing negligence claims in their FAC, which does not automatically waive their

13   ability to assert such claims in their SAC.

14       NaphCare also argues Plaintiffs' common law negligence and gross negligence claims

15   fall within the ambit of medical negligence under Revised Code of Washington Chapter 7.70.  In

16   Washington, an action for damages for injuries occurring as a result of health care is governed by

17   Revised Code of Washington Chapter 7.70.   The statute "sweeps broadly" and clearly "states

18   that [Revised Code of Washington Chapter] 7.70 modifies procedural and substantive aspects

19   of *all* civil actions for damages for injury occurring as a result of health care, regardless of how

20   the action is characterized."  *Branom v. State*, 974 P.2d 335, 338 (Wash. Ct. App. 1999); *see also*

21   *Rahman v. Pierce Cnty.*, No. C06-5262 RBL/KLS, 2007 WL 2712994, at *4 (W.D. Wash. Sept.

22   14, 2007).  Revised Code of Washington § 7.70.030 provides:

23

24

No award shall be made in any action or arbitration for damages for injury occurring as the result of health care which is provided after June 25, 1976, unless the plaintiff establishes one or more of the following propositions:

(1) That injury resulted from the failure of a health care provider to follow the accepted standard of care;

(2) That a health care provider promised the patient or his or her representative that the injury suffered would not occur;

(3) That injury resulted from health care to which the patient or his or her representative did not consent.

Wash. Rev. Code § 7.70.030.  The term "healthcare" as used by the statute means "the process in which a physician is utilizing the skills which [they] had been taught in examining, diagnosing, treating or caring for the plaintiff as [their] patient." *Branom*, 974 P.2d at 339 (internal quotations omitted).  A plaintiff seeking to recover for medical negligence must establish (1) "[t]he health care provider failed to exercise that degree of care, skill, and learning expected of a reasonably prudent health care provider at that time in the profession or class to which he or she belongs, in the state of Washington, acting in the same or similar circumstances" and (2) "[s]uch failure was a proximate cause of the injury complained of."  Wash. Rev. Code § 7.70.040.

In response, Plaintiffs argue they "pled negligence and gross negligence claims against NaphCare, and [Revised Code of Washington] Chapter 7.70 does not require additional pleading requirements above or beyond those required for negligence claims in general."  (Dkt. No. 88 at 5.)  Plaintiffs concede the distinction "may become relevant at the summary judgment stage[.]"

Reviewing the SAC, the Court finds Plaintiffs have successfully pled a medical negligence claim.  Two NaphCare mental health professions, Defendants John Doe 6 and John Doe 7, allegedly met with Ms. Rogers but failed to intervene or provide treatment despite knowing Ms. Rogers' mental health was rapidly worsening.  (Dkt. No. 77 at 21–22.)  Plaintiffs further allege these NaphCare employees "failed to exercise reasonable care in their provision of

1    Ms. Rogers' health, welfare, and safety which caused Plaintiffs' injuries." (*Id.* at 37.)  Although

2    Plaintiffs do not identify the statute, the Court finds Plaintiffs assert a medical negligence claim

3    under the Revised Code of Washington Chapter 7.70.

4            NaphCare provides no authority to support dismissal of Plaintiffs claims for failing to cite

5    the statute, and the Court is not persuaded Plaintiffs' failure to classify their claims as medical

6    negligence calls for dismissal.  NaphCare's argument prioritizes form over substance.  Even

7    when a plaintiff fails to cite the correct statute by which to assess or interpret their allegations

8    "specifying an incorrect [legal] theory is not fatal."  *Bartholet v. Reishauer A.G.*, 953 F.2d 1073,

9    1078 (7th Cir. 1992) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)).

10           That said, Plaintiffs do not allege Ms. Rogers injuries resulted from NaphCare's common

11   law negligence or gross negligence.  Revised Code of Washington Chapter 7.70 is the *exclusive*

12   remedy for injuries resulting from a healthcare providers failure to follow the accepted standard

13   of care.  *See* Wash. Rev. Code § 7.70.040.  Accordingly, to plead common law negligence and

14   gross negligence Plaintiffs must allege Ms. Rogers was injured by NaphCare for a non-

15   healthcare related reason.  The SAC identifies only two NaphCare employees who interacted

16   with Ms. Rogers, and their conduct related only to mental health treatment.  In their response,

17   Plaintiffs identify no other basis for their negligence and gross negligence claims against

18   NaphCare.  Plaintiffs fail to allege separate claims for common law and gross negligence, so

19   NaphCare's motion to dismiss is GRANTED as to those claims.  NaphCare's motion to dismiss

20   is DENIED as to Plaintiffs' medical negligence claim.

21       **D.  ADA Claim Against Kitsap County**

22           Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified

23   individual with a disability shall, by reason of such disability, be excluded from participation in

24

or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim of disability discrimination under Title II, a plaintiff must allege four elements:

> (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002) (citations omitted). An individual has a qualifying disability under the ADA if the individual: (1) has a physical or mental impairment that substantially limits one or more of the individual's major life activities; (2) has a record of such an impairment; or (3) is seen as having such an impairment. 42 U.S.C. § 12102(1). Major life activities include "[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working[.]" 29 C.F.R. § 1630.2(i).

Plaintiffs allege Ms. Rogers suffered from bipolar disorder, posttraumatic stress disorder, anxiety, and major depressive disorder, all of which "limited her major life activities[,]" including not "being able to care for herself and her children, eating, working, communicating, thinking, sleeping, and concentrating." (Dkt. 77 at 18.) Plaintiffs also allege Ms. Rogers routinely refused to eat while in custody at the Jail (*see id.* at 21–23) and often expressed delusions (*see id.* at 18–19, 21–22). Ms. Rogers' mental health issues allegedly caused "high degrees of paranoia and delusion" such that Ms. Rogers "was often despondent and difficult to interact with." (*Id.* at 18.) Plaintiffs allege the Jail staff "ignored, dismissed, or failed to intervene and treat the worsening symptoms of [Ms. Rogers'] mental illness because . . . they

1   were frustrated, irritated, or otherwise perturbed by her disordered thinking and behavior[.]"  (*Id.*

2   at 23.)  Because of her mental disability, Jail staff were allegedly disbelieving, dismissive, and

3   ignored Ms. Rogers' worsening condition.  (*Id.* at 41.)

4          Kitsap County argues Plaintiffs fail to allege Ms. Rogers was excluded from services by

5   reason of her disability.  (Dkt. No. 78 at 20.)  Viewing the facts in the light most favorable to

6   Plaintiffs, one could find Ms. Rogers' delusional and paranoid behavior led to Jail staff being

7   irritated or dismissive of Ms. Rogers, so she was denied care.  This claim differs from the one

8   outlined in the FAC because Plaintiffs now allege facts showing the extent of Ms. Rogers'

9   mental health issues, including her inability to eat and think clearly.  (*Compare* Dkt. No. 77 at 18

10  *with* Dkt. No. 41 at 13.)  Plaintiffs also allege Jail staff denied Ms. Rogers treatment because of

11  their frustration with her behavior.  (Dkt. No. 77 at 23, 41.)  Although it is uncertain whether a

12  complete factual record ultimately will support Plaintiffs' theory, Plaintiffs have sufficiently

13  alleged an ADA claim against Kitsap County under Federal Rule of Civil Procedure 12(b)(6).[8]

14  Kitsap County's motion to dismiss is DENIED as to Plaintiffs' ADA claim against Kitsap

15  County.

16         It is unclear from the SAC whether Plaintiffs try to allege an ADA claim against

17  NaphCare.  In their response, Plaintiffs clarify they do not intend to raise such a claim.  (Dkt. No.

18

19

20  [8] Plaintiffs argue "the Ninth Circuit recognizes *Monell*-like policy, custom, or practice theories of ADA liability, including failure to train[.]"  (Dkt. No. 85 at 23.)  In its reply, Kitsap County does not address Plaintiffs' failure to train theory under the ADA.  (*See* Dkt. No. 86 at 11–12.)  The Court notes "a failure to train theory under the ADA . . . does not appear to be universally accepted" although some district courts have accepted these types of claims.  *Est. of Jackson v. City of Modesto*, No. 1:21-CV-0415 AWI EPG, 2021 WL 4819604, at *11 (E.D. Cal. Oct. 14, 2021).  As Defendants did not address Plaintiffs' failure to train theory, this issue is not fully briefed.  Because the Court finds Plaintiffs state a typical ADA claim, this order does not consider whether Plaintiffs' failure to train theory is legally proper nor whether the SAC adequately states a claim on that basis.

21

22

23

24

88 at 9.)  Therefore, to the extent the SAC raises an ADA claim against NaphCare, the Court

GRANTS NaphCare's motion to dismiss as to Plaintiffs' ADA claim.

### E.  CONCLUSION

Accordingly, and having considered Defendants' motions, the briefing of the parties, and

the remainder of the record, the Court finds and ORDERS that Defendants' motions to dismiss

are GRANTED in part and DENIED in part as follows:

1. Kitsap County's motion to dismiss (Dkt. No. 78) is GRANTED as to Plaintiffs' § 1983

claims against Defendants Elvia Decker and Does 1–5 for failure to state a claim and

DENIED as to all other claims and parties.

2. NaphCare Inc.'s motion to dismiss (Dkt. No. 80) is GRANTED as to Plaintiffs' ADA,

common law negligence, and gross negligence claims against NaphCare for failure to

state a claim.  NaphCare Inc.'s motion to dismiss (Dkt. No. 80) is GRANTED as to the

§ 1983 claims against NaphCare Inc. and Defendants Does 8–10 for failure to state a

claim.  NaphCare Inc.'s motion to dismiss is also GRANTED as to Defendants Jim

McLane, Susanne Moore, Marsha Burgess, Amber Simpler, Jeffrey Alvarez, Bradford

McLane, Cornelius Henderson, and Gina Savage for lack of personal jurisdiction.

Plaintiffs' request to conduct jurisdictional discovery is DENIED.  NaphCare's motion to

dismiss is DENIED as to all other claims and parties.


Dated this 13th day of March 2023.

David G. Estudillo
United States District Judge